UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 08 CR 107 |
| DONALD THOMAS | ) | |
| JOSEPH MILLER | ) | Judge Elaine E. Bucklo |
| JOHN LEWIS | ) | |
| CHRISTOPHER MARCHETTI and | ) | |
| ALONZO BRAZIEL | ) | |

**GOVERNMENT'S MOTION *IN LIMINE* TO
INTRODUCE DEFENDANTS' STATEMENTS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully moves *in limine* that this Court admit at trial testimony concerning certain statements made by some of the defendants, and rule that defense counsel may not elicit hearsay portions of the confessions that would run afoul of *United States v. Bruton*, 391 U.S. 123 (1968) and its progeny.

**I.    Factual Background Relating to Statements**[1]

The government expects the evidence at trial to establish that Donald Thomas, Joseph Miller, John Lewis, Christopher Marchetti and Alonzo Braziel participated in the wide-ranging mortgage fraud scheme set forth in the indictment. Although each of these defendants played a particular role in ensuring the success of the fraud scheme, they also worked together in their joint criminal

---

[1] This motion does not address the admissibility of defendants' statements under other rules of evidence. For example, if any of the defendants testifies, the statements may be used for impeachment (Fed. R. Evid. 608, 613). Moreover, if any defendant chooses to testify at trial, *Bruton* is not implicated, and the government would be entitled to introduce the entire, unredacted statement by the testifying defendant at the appropriate time. *See United States v. Clark*, 989 F.2d 1490 (7th Cir. 1993). Any co-defendant's Confrontation Clause rights would be satisfied by the opportunity to cross-examine the testifying defendant about his statement. *Id*.

venture. Donald Thomas and Christopher Marchetti rehabbed, bought and sold properties, often in partnership with Lawrence Skrobot, James Robert Thomas and Joseph Green. When they purchased properties, they supplied false information, including false leases, false employment documents, false verifications of rent and other false documents. Thomas and Marchetti also recruited buyers, and acted as facilitators on the property closings, including working with buyers to obtain kickbacks for the buyers and for themselves. They also used earnest money from Skrobot to make down payments that appeared as if they buyers (including themselves) were the true source of the payments.

Joseph Miller was a loan officer for several properties charged in the scheme. He created false documents and loan applications, and he directed his co-defendants to provide false documents to qualify for loans.

John Lewis acted as an accountant. He also provided false verifications of rent and accompanying letters. He signed the verifications of rent and letters in his own name and in the name of his client, "Lee Taylor." These false verifications were submitted with the false loan application packages sent to Miller for Thomas, Marchetti, Braziel and others.

Alonzo Braziel purchased three properties identified in the indictment. To qualify for the loans he received, Braziel submitted false documents, including false employment documents and information, and false "Lee Taylor" verifications of rent.

The false documents and information were not disclosed to the lenders, who would not have made the loans if they had known the documents and applications were false. The defendants also concealed the true financial arrangements (*e.g.*, false sources of down payment funds, undisclosed buyer kickbacks) from the lenders, who would not have provided the loans had they known of the

true financial arrangements.

Once law enforcement officers began investigating the fraud scheme, they approached the scheme participants to interview them. They obtained statements from each of the defendants going to trial. While some of these statements contain false exculpatory remarks, they also contain statements against interest admissible under Fed. R. Evid. 801(d)(2). The government seeks to introduce the defendants' confessions set forth in Section III, none of which implicate *Bruton*, as detailed herein.

**II.     Argument**

    **A.     Admitting Defendants' Confessions Will Not Implicate *Bruton*.**

Because the government intends to offer the statements of defendants outlined above in a joint trial, and because the possibility exists that the defendants will not testify at that trial, their confessions may implicate *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny. Under *Bruton*, the admission of a defendant's confession at a joint trial may violate a co-defendant's right to confrontation if the confession also names the co-defendant. *Id.* at 126. However, the law is clear that a redacted form of the statement in which the co-defendant is not referred to by name, coupled with a limiting instruction, satisfies the dictates of *Bruton* and protects the constitutional rights of both defendants. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).[2] The law is also clear that where the government elicits only those portions of a confession that do not implicate the confessor's co-

---

[2] The government respectfully requests a pretrial ruling on this issue. Should the Court deny the government's motion in its entirety, and thus refuse to permit the government to introduce the more narrow portions of defendant's statements, the government will need to consider the possibility of moving the Court for a severance so as to obviate any Sixth Amendment issues. *See* Fed. R. Crim. P. 14 (allowing for severance upon motion of the government where government's case is prejudiced by a joint trial).

defendants (as the government seeks to do here), there is no *Bruton* issue.

    *Bruton* concerned a trial in which two defendants were tried jointly for armed postal robbery and one defendant confessed orally to a postal inspector that the defendant and the petitioner/co-defendant had committed the robbery. *Bruton*, 391 U.S. at 124. That confession was introduced at trial and the defendant who had confessed failed to testify. During the course of the trial, the trial judge instructed the jury that although the non-testifying defendant's confession was competent evidence against him, it was inadmissible hearsay against the petitioner and had to be disregarded in determining the petitioner's guilt or innocence. *Id*. at 125. The *Bruton* Court reversed the conviction on the grounds that the petitioner had been deprived of his sixth amendment right of confrontation because of the facially incriminating confession of the non-testifying defendant introduced at their joint trial. *Id*. at 135-36. The Court reversed even though the jury had been instructed to consider the confession only against the non-testifying defendant. *Id*.

    In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court narrowed the scope of *Bruton's* holding. In *Richardson*, the prosecution introduced a confession given by one of three defendants shortly after arrest. *Richardson*, 481 U.S. at 203. At the time the confession was submitted, the jury was admonished not to use it in any way against the petitioner/co-defendant. *Id*. at 204. The defendant who confessed did not testify at trial. *Id*. The *Richardson* Court rejected the petitioner's *Bruton* claim and affirmed the conviction. *Id*. at 211. The Court held that when a non-testifying defendant's statement must be linked to other evidence to implicate a co-defendant, admitting a statement at a joint trial does not violate the Confrontation Clause of the Sixth Amendment so long as the trial judge adequately instructs the jury not to consider the statement against the co-defendant. *Id*. at 208-211. The Court reasoned that where the jury must link a non-

testifying defendant's statement to other evidence for the statement to implicate a co-defendant, the probability that the jury would not be able to follow a limiting instruction does not exist as it did in *Bruton*. *Id*. at 208. *Accord United States v. Brooks*, 125 F.3d 484, 501 (7th Cir. 1997) ("We have held that the redaction of a defendant's name and its replacement with such references as 'another person,' combined with a limiting instruction, complies with the right of confrontation and satisfies Bruton and Richardson.") (citing cases).

More recently in *Gray v. Maryland*, the Supreme Court stated that "[u]nless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found." 118 S. Ct. 1151, 1155 (1998). *Gray* answered an unresolved question from the *Richardson* case -- whether a "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton*'s protective rule." *Id.* at 1155. The Court held that the confession at issue in that case, which substituted blanks and the word 'delete' for defendant's name, was inadmissible under *Bruton*. *Id.* at 1157. In doing so, however, the Court maintained its approval for the use of redacted confessions with accompanying limiting instructions, and it simply distinguished the flawed redacted confession from Gray's case with an appropriate redacted confession from *Richardson*. *See id.* at 1156-57. *Gray* thus reiterated the rule that a confession that is redacted to omit references to a co-defendant (who is on trial) is admissible at a joint trial.

Subject to the proscriptions in *Gray*, in cases where the government intends to introduce the statements of a non-testifying defendant against that defendant, the rights of a co-defendant are protected by a redaction if the statement does not identify the co-defendant *on its face* -- even if

other evidence at trial does tend to identify the co-defendant as the person referred to in the statement. A co-defendant's rights are similarly protected if the confession does not mention any actions taken by, or directions received from, a non-testifying co-defendant. The Seventh Circuit has restated this principle in case after case: one defendant's confession may be admitted where a co-defendant's name has been replaced by a neutral pronoun or other more general reference, or omitted in its entirety. *See, e.g., United States v. Strickland*, 935 F.2d 822, 826 (7th Cir. 1991) ("the replacement of defendants' names with references such as 'another person,' combined with an instruction to consider the confession against only the declarant, satisfies *Bruton*); *United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990); *United States v. Madison*, 689 F.2d 1300, 1309 (7th Cir. 1982) (holding as admissible non-testifying defendant's statement that "somebody else" was present at the scene of the crime because statement did not identify co-defendant by name or any other descriptive feature); *United States v. Holleman*, 575 F.2d 139, 142 (7th Cir. 1978) (*Bruton* not violated when defendant's confession indicates he was assisted by accomplices but "his accomplices remain in the confession unnamed and not identified by race, age, size or any other means except by sex").

In the confessions at issue in this case, the government proposes to only elicit the confessions that implicate the confessor and to avoid any accusations leveled against any co-defendant proceeding to trial. If, however, the court requires additional detail, or more information is required under the rule of completeness, the government requests that all counsel abide by *Bruton* and appropriately refer to co-defendants by neutral designations such as "another person." In this manner, no one runs afoul of defendants' Sixth Amendment rights. The use of a neutral pronoun or general reference is permissible even where those references in conjunction with other evidence

at trial implicate the defendant. *See, e.g., Briscoe, supra; Myers*, 892 F.2d at 648; *Madison*, 689 F.2d at 1309. The Seventh Circuit restated this principle in *United States v. Chrismon*, 965 F.2d 1465 (7th Cir. 1992), upholding the admission of a confession referring to other persons, ostensibly co-defendants, where the "statement includes only a reference to a collective and thus incriminates a member of the group only when linked with other evidence." *Id.* at 1471, *citing Briscoe, supra. See also United States v. Hubbard*, 22 F.3d 1410, 1421 (7th Cir. 1994).

Along the same lines, defense counsel should be precluded from asking questions of the agents about what another defendant said, conveyed through a co-defendant's confession. Such questions necessarily call for hearsay, and could only be asked for the purpose of running afoul of *Bruton* and creating a mistrial. As such, the government seeks an order *in limine* precluding defense counsel from asking such questions of the agents.

To insure that a witness does not inadvertently mention a co-defendant's name during the course of testimony about the defendant's statements, the government requests permission to lead the witnesses in this area. *See United States v. Clark*, 989 F.2d 1490, 1499 (7th Cir. 1993) (trial court could confine witness' testimony regarding defendant's admission by allowing leading questions to avoid *Bruton* problems). These proposed redactions fall within the confines of the Supreme Court's *Richardson* decision, because they "omit all reference" to specific co-defendants at trial. *See Richardson*, 481 U.S. at 203. Moreover, these deletions comply with the more stringent requirements set out in the *Gray* case because they do not "replace a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol." *Gray*, 118 S. Ct. at 1155.

Finally, to further ensure compliance with *Bruton*, the government respectfully requests that

the Court consider instructing the jury at the end of the trial that it "may not consider [any defendant's statement] as evidence against any defendant other than the one who made it." *See* Seventh Circuit Committee Pattern Jury Instructions § 3.02 (1999). The above redactions, coupled with such a limiting instruction, would ensure that this trial remains free of any Confrontation Clause violations:

> [T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

*Richardson*, 481 U.S. at 211.

### B. Defendants Should Be Precluded From Attempting to Introduce Hearsay Through Testimony of a Co-Defendant's Confession.

Portions of the defendants' confessions not detailed in Section III *infra* are false exculpatory statements, as well as hearsay, and they should be excluded. The Supreme Court has made clear that exculpatory statements such as the those made by defendants are not admissible at trial. *See Williamson v. United States*, 512 U.S. 594 (1994). Only those declarations or remarks within a confession "that are individually self-inculpatory" are admissible. *Id.* at 600. The correct reading of Rule 804(b)(3) "is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600-01. As the Supreme Court explained in *Williamson*: "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements." *Id.* at 600. "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts," because, as the *Williamson* Court made clear:

"One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.*

The Seventh Circuit has consistently followed the reasoning and holding in *Williamson*. "[A]fter *Williamson*, each portion of the proffered out-of-court statement must be examined to determine whether it tended to subject the declarant to criminal liability." *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995); *See also United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). Likewise, in *Carson v. Peters,* the Seventh Circuit followed *Williams*on and held portions of a confession inadmissible even though they were part of a general confession. 42 F.3d 384 (7th Cir. 1994). The defendant sought to introduce evidence that his brother had confessed to a shooting and in that confession stated that he had worn a white hat. *Id.* at 385. A witness to the shooting had seen an individual wearing a white hat at the window where the shots were fired. *Id.* at 386. "Portions of inculpatory statements that pose no risk to the declarants are not particularly reliable; they are just garden variety hearsay." *Id.* The Seventh Circuit affirmed the state court's reasoning that the statement by the brother that he had worn a white hat could have been intended by his brother to draw attention away from a possible third participant in the shooting and was therefore inadmissible. *Id.* The Seventh Circuit held that the statement when viewed separately was properly excluded even though the statement was part of a general confession.

In this case, it is evident that the defendants' minimized statements do not fit the exception carved out by Rule 804(b)(3). Rule 804(b)(3) requires that the proponent of an inculpatory hearsay statement show that: "(1) the declarant is unavailable to testify at trial; (2) the statement was against the declarant's penal interest; and (3) corroborating circumstances bolster the statement's trustworthiness." *United States v. Shukri*, 207 F. 3d 412, 416 (7th Cir. 2000). These statements fail

the requirements of Rule 804(b)(3). The statements are not against defendants' penal interest, but rather statements made to avoid prosecution for being members of a mortgage fraud scheme. They were also made pre-arrest, in a voluntary setting. The burden of showing that there are corroborating circumstances is on the proponent of the evidence. *United States v. Amerson*, 185 F. 3d 676, 686 (7th Cir. 1999).

## II.     Proposed Testimony

As agents investigated this case, they obtained statements from the defendants proceeding to trial. As set forth herein and as explained above, the government seeks to admit only those portions of the defendants' confessions that do not implicate their co-defendants. These statements are summarized as follows:

### A.     Donald Thomas

On December 30, 2005, FBI Special Agent Donald Kaiser interviewed Donald Thomas. Thomas told Agent Kaiser he was the owner of Golden Key Construction, Inc., a construction company. He said he does not issue IRS Forms 1099 or W-2 to his contract employees, and he has never operated his company under any other or similar name.

Thomas admitted he was involved in purchasing, renovating and reselling real estate -- he locates properties, then purchases, renovates and resells the properties. He further said his deals have been financed by Lawrence Skrobot. Thomas told the agents he recalled working with Skrobot on properties located at 14820-22 Hoyne Avenue in Harvey (Count 17), 13302 S. Francisco in Robbins (Count 13) and another property. Thomas admitted that when the properties were sold, Skrobot paid Thomas from the proceeds from the sale. Thomas also admitted paying the property buyers out of his share of the proceeds whenever he had agreed to pay buyers to  purchase

properties. Thomas also said he knew Skrobot had financed property purchases for James Robert Thomas, Joseph Green and "John," whose last name he could not remember. Thomas particularly recalled receiving $20,000 in proceeds from the sale of 14820-22 Hoyne in Harvey, and that he received the money from Skrobot.

Agents again interviewed Thomas on August 15, 2006. On that date, Thomas confirmed he owns Golden Key Construction and does not issue IRS Forms 1099 or W-2 to his employees. Thomas further stated that he is self-employed, and has created W-2 Forms and pay stubs for himself. Thomas further admitted he created the pay stubs and W-2 Forms included in the loan files for properties located at 13302 S. Francisco and 14611 S. Justine in Harvey (Count 14). He claimed to have included the gross income from his self employment on the forms. Thomas could not explain why other individuals' pay stubs were similar in appearance to the pay stubs Thomas claimed to have created.

Lastly, Thomas told agents he was aware the FBI had visited Joseph Green because Green informed him of the visit the same day it had happened.

**B.     John Lewis**

On December 15, 2005, John Lewis was interviewed by FBI Special Agent Donald Kaiser. In the interview, he told Agent Kaiser he was trained as an accountant. He also said his phone number is (708) 544-6622 and his fax number is (708) 544-6633.

On June 28, 2006, Lewis was again interviewed and, among other things, told agents he called one of his clients the same day he was interviewed by law enforcement in December 2005. He also identified his signature as the "John Lewis" who signed a February 18, 2004, verification of rent for Carlyon Jones, for the purchase of 123 W. 16th Street in Chicago Heights. He further

admitted that most of the information on the verification was inaccurate, including the address where Jones purported to rent and the spelling of Lewis' company. Lewis further stated that Jones did not rent from Lewis during the period of time on the verification, nor did he rent from Lewis at the address on the form. Lewis also said his company identified on the verification, Lewis & Associates, was out of business as of the date of the verification.

Lewis also said he knew Earnest Lee Taylor, and identified his photo.

### C.     Christopher Marchetti

FBI agents interviewed Christopher Marchetti on June 15, 2006. In that interview, Marchetti told Agent Kaiser he started working with Skrobot in Fall 2004. Skrobot and his partner, Tim Tatum, funded the projects, and Marchetti was responsible for finding the properties to purchase and renovate. Marchetti and Skrobot had an agreement where Skrobot wanted a 20% return on whatever investment he made, to be paid from the closing proceeds. Skrobot imposed penalties on Marchetti if the property did not sell in a specific period of time.

Marchetti admitted to participating in 8 or 9 projects funded by Skrobot, including 343 W. 26th Street in Chicago Heights (Count 10) and 49 W. McEldowney in Chicago Heights (Count 16). Marchetti also admitted he located a buyer and referred her to Skrobot to purchase properties. He further admitted that the buyer's kickbacks were not reported on HUD-1 Settlement Statements and he knew she needed Skrobot's money for the down payment on one of the properties.

Marchetti admitted signing the HUD-1 Settlement Statement and Form 1030 Loan Application for 343 E. 26th Street. He provided information to the loan officer over the phone. Marchetti further admitted he signed the seller second mortgage note, and further confessed that he knew Skrobot did not expect him to pay back the note, despite the language on the document

requiring repayment. In accordance with their understanding, Marchetti has not made any payments on the note.

Marchetti also confessed that Skrobot provided him with $13,000 in earnest money funds for the purchase of 343 E. 26th Street. On the same day Skrobot gave Marchetti the money for the earnest money deposit, Marchetti obtained a cashier's check and repaid Skrobot. He further confessed the down payment was handled in this manner to create a paper trail so the real estate transaction could be completed.

Marchetti also admitted he signed a seller second mortgage note for 49 W. McEldowney, knowing he did not have to repay the note as indicated on its face. In accord with their agreement, Marchetti has not made any payments on the note. Marchetti also asked Skrobot to provide him with the down payment money for 49 W. McEldowney, Skrobot agreed, and gave him $15,000. Marchetti took the money and obtained a cashier's check made payable to Skrobot as an earnest money deposit. Marchetti confessed the transaction was done in this manner to provide a paper trail and to falsely make it appear as though the funds were Marchetti's, when they were not.

Marchetti further admitted the sub-contractor agreements provided for the 49 W. McEldowney transaction were also false, and he did not know all the people on the agreements. Marchetti had seen Joe Green's name on documents Skrobot provided to him, and Marchetti created sub-contractor agreements for Green based on those documents. Marchetti further stated he forged Skrobot's signature on the documents with his permission. Marchetti also accepted from Skrobot copies of checks he could use to submit as proof of renovation costs. Marchetti did not know whether the checks actually related to 49 W. McEldowney, but he did not believe they accurately reflected the true costs of renovation. Marchetti also stated he created false leases for 49 W.

McEldowney, even though he did not yet own the properties and there were no tenants.

### D. Alonzo Braziel

In an October 25, 2005, interview, Braziel told agents he began working for A-OK Construction (the employer identified on his loan applications), in June 2004. He further stated he did not receive a W-2 wage and tax statement from A-OK Construction, his purported employer. When shown a verification of rent form from mortgage files for properties he purchased, Braziel told agents the information on the form was false; he did not know the person who signed the form (Lee Taylor) or Mr. Taylor's company (Five West Management). Braziel also confessed that he did not provide his own money for earnest money on any of the three properties he purchased. Rather, he accepted money from Lawrence Skrobot. The money was deposited into Braziel's TCF bank account, but was not kept there. It was only used to obtain a cashier's check to use as a down payment.

## IV. Conclusion

For the aforementioned reasons, defendants' confessions to FBI Special Agents and Postal Inspectors are admissible as outlined herein and will satisfy *Bruton*.

Dated: February 20, 2009

                                              Respectfully submitted,

                                              PATRICK J. FITZGERALD
                                              United States Attorney

By:   /s/ Lisa M. Noller
       LISA M. NOLLER
       MEGAN CUNNIFF CHURCH
       Assistant United States Attorney
       219 South Dearborn Street
       Chicago, Illinois 60604
       (312) 353-5314

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electric Case Filing (ECF), that the Government's Motion *In Limine* To Introduce Defendants' Statements was served on Clarke Devereaux, Clarence Burch, J. Clifford Greene, Ellen Domph and Michael Petro, pursuant to the district court's ECF system, on February 20, 2009.

By:   /s/ Lisa M. Noller
      LISA M. NOLLER
      MEGAN CUNNIFF CHURCH
      Assistant United States Attorney
      219 South Dearborn Street
      Chicago, Illinois 60604
      (312) 353-5314