UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 107-17 |
| | ) | |
| ALONZO BRAZIEL | ) | Hon. Elaine E. Bucklo |

**UNITED STATES' RESPONSE TO
ALONZO BRAZIEL'S POST-TRIAL MOTIONS**

Defendant Alonzo Braziel has moved for acquittal and a new trial (although he has not specified which grounds form a basis for which motion). Because the government has met its burden of proof beyond a reasonable doubt based on evidence the Court properly admitted, Braziel's motions should be denied.

**I.    LEGAL STANDARDS**

   **A.    Federal Rule of Criminal Procedure 29: Motion for Judgment of Acquittal**

In deciding a motion for judgment of acquittal pursuant to Fed.R.Crim.Pro. 29, a court does not re-weigh the evidence or judge the credibility of witnesses. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000) ("As long as there is a reasonable basis in the record for the jury's verdict, it must stand."). In *United States v. Blassingame*, the Seventh Circuit observed:

> Motions for acquittal should be granted only where "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). The appellant "faces a nearly insurmountable hurdle [because] . . . . we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."

197 F.3d 271, 284 (7th Cir. 1999), *cert. denied*, 529 U.S. 1138 (2000) (*quoting United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)). *See also United States v. Benjamin*, 116 F.3d 1204,

1206 (7th Cir. 1997) (standard for district court on Rule 29 motions same as standard for Court of Appeals). *See also United States v. Genova*, 333 F.3d 750 (7th Cir. 2003) ("Rule 29(c) does not authorize the judge to play the thirteenth juror. . . .The issue on a motion under Rule 29(c) is the same as the issue on appeal: whether the evidence, taken in the light most favorable to the verdict, permits a sensible person to find beyond a reasonable doubt that the defendant committed the crime alleged.") (internal citation omitted).

### B.     Federal Rule of Criminal Procedure 33: Motion for a New Trial

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Motions for new trials in criminal cases are addressed to the sound discretion of the trial court. However, it is well settled that such motions are not favored and should be granted sparingly, with great caution and only in exceptional circumstances. *See, e.g.*, *United States ex rel. Darcy v. Handy*, 351 U.S. 454 (1956). The court should be mindful that the power bestowed by Rule 33 to grant a new trial should only be done in the "most 'extreme cases.'" *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990)). To prevail on a motion for a new trial, a defendant must demonstrate that substantial prejudice occurred during the trial, resulting in a gross miscarriage of justice. The burden upon a defendant to establish the existence of prejudicial error is a heavy one, not satisfied by unsupported conclusory allegations or speculation. *Darcy*, 351 U.S. 454.

## II.    FACTUAL BACKGROUND

The evidence at trial proved beyond a reasonable doubt that from in or about January 2003 and continuing through in or about November 2005, Alonzo Braziel and others knowingly devised,

attempted to devise, and participated in a scheme to defraud and to obtain money and property owned by and under the custody and control of banks and lenders by means of materially false and fraudulent pretenses, representations, and promises.  In sum, Lawrence Skrobot and James Robert Thomas recruited others to take advantage of the booming real estate market.  They purchased properties, hired people to quickly rehab them, found buyers who did not qualify for loans but who were willing to sign false loan applications, directed the buyers to loan officers and processors who knew the loan applications were false, purchased false documents and verifications to corroborate the buyers' false statements, then sold the properties at a substantial profit.  As a result of the scheme, lenders provided approximately $7.2 million in loans. Most of the loans went into foreclosure when the buyers could not make the mortgage payments.

More particularly, Lawrence Skrobot, James Robert Thomas, Donald Thomas, Jonathon Marchetti and Joseph Green (together, "the recruiters") recruited individuals, including Alonzo Braziel, to buy properties by promising potential buyers "no money down" deals and undisclosed "cash back at closing" from sale proceeds.  They also promised the buyers that the properties were ready for occupancy and that they would not have to make any payments on either the mortgages or seller second notes executed in connection with the sales of the properties.  Where potential buyers (such as Donald Thomas, Alfredo Hilado, James Green and Alonzo Braziel) did not qualify for loans or the loan amounts they needed to avoid any down payments, the recruiters obtained false documents to support the false statements the buyers provided to the lenders.  The buyers well knew the information in their loan applications and on the resulting HUD-1 settlement statements was false because they saw and signed the statements, and obtained money and properties they well knew they could not afford.  In particular, Braziel knew he did not work for A-OK Construction

since he and Donald Thomas paid A-OK owner Keenan Haynes to falsely verify his employment there.  Moreover, the government introduced testimony from Keenan Haynes that after he learned of the government's investigation, Braziel tried to pay Haynes to create false documents to help him prove he worked for A-OK to cover his tracks.

At trial, the government introduced evidence from three of the scheme's recruiters – James Robert Thomas, Jonathon Marchetti and Joseph Green.  Each of these witnesses explained that they used money from coconspirator Lawrence Skrobot to purchase properties, rehab them and sell them to buyers who qualified for loans with false information.  James Robert Thomas testified he knew it was illegal to provide false information to lenders to obtain mortgages, but he did whatever he needed to do to "get the deal done."  James Robert Thomas further testified that he worked with Donald Thomas to obtain false pay stubs and IRS Forms W-2 to qualify buyers such as Alonzo Braziel, who Donald Thomas and James Robert Thomas both knew did not have sufficient income to purchase property, much less three properties in a short period of time.  Marchetti testified that he, too, provided false information to qualify himself for loans, and he also recruited buyer Alfredo Hilado to purchase properties he could not afford.  Joseph Green testified similarly to James Robert Thomas and Marchetti, and additionally described how he recruited Darryl Daugherty to purchase a property located at 5708 S. Normal (Count Fifteen) and worked with Donald Thomas to obtain false documents to qualify Daugherty for the loan he received.

To ensure the false documents and verifications went unquestioned, the buyers were referred to coconspirators Varena McCloud (loan officer) and Charline Batalla (loan processor) at Equity Express, or to coconspirator Joseph Miller (loan officer) at Integrity Home Mortgage, so mortgage loan applications could be prepared.  McCloud, Batalla and Miller obtained false information from

the buyers to qualify them for loans to which they were not otherwise entitled. They also instructed the buyers to obtain false documents and verifications on their own, and to return to their respective brokerages after obtaining the false documents. These documents included false verifications of rent (VORs), false leases, false income information such as W-2 forms and pay stubs, false construction receipts and false second mortgages, among other documents. Coconspirator Hattie Brooks testified that McCloud paid her to provide false VORs from her company, Ezra, Inc., to make it appear as though the buyers rented from her when they did not. Marchetti testified that Miller directed him to provide false information and documents to qualify for several loans he obtained from lenders. Bank records, loan documents and testimony proved that McCloud, Batalla and Miller were also paid under the table by Skrobot and other coconspirators, in undisclosed kickbacks.

To obtain the maximum amount of financing for the unqualified buyers, Skrobot, James Robert Thomas and Jonathon Marchetti also issued false seller second mortgages, purporting to loan the buyers funds to be applied toward the purchase of the property and which were to be repaid, when in fact, the sellers and the buyers had an agreement that neither the seller second mortgage or note would be repaid in any part. Another undisclosed financial benefit proved by the testimony of witnesses (including uncharged buyers) and bank records was that the buyers did not have to pay their own earnest money or down payments, and often received kickbacks after the closings. Skrobot, James Robert Thomas and others provided, and caused others to provide, down payment and earnest money checks for the buyers that were false in that the checks listed the buyers as remitters, when in fact the buyers were not remitters and had not contributed any money toward a down payment or earnest money. Moreover, Skrobot, James Robert Thomas and others caused these false down payment and earnest money checks to be presented at closings to deceive lenders by

creating the false impression that the buyers had made down payments and had paid earnest money. None of these financial arrangements was disclosed to the lenders, to whom the information was material.

Miller's boss Nick Baffes explained at trial that Miller was a trained loan officer who understood from his training, experience and licensure that he had to provide lenders with true and accurate information to obtain mortgage loans on behalf of his clients. Baffes also explained and reviewed with the jury the contracts Integrity Home Mortgage entered into the lenders – contracts that required the provision of true and accurate information to obtain loans.

The government also introduced testimony from Heather McCartney and Oren Kleinmuntz from Fremont and Argent, respectively. Both McCartney and Kleinmuntz testified that lenders relied on the information provided to them by loan officers in deciding whether to fund a transaction, and if so, how much money to provide. They further testified to many of the documents in the loan files and confirmed that they relied on the documents in this case which turned out to be false. In particular, McCartney and Kleinmuntz reviewed VORs, verifications of employment (VOEs), verifications of deposit (VODs), income documents such as IRS Forms 1099 and pay stubs, loan applications, leases, construction receipts, the source of funds and a buyer's assets and liabilities when deciding whether, and how much, to loan.

Keenan Haynes, the owner of A-OK Construction, also testified that he knew Donald Thomas and Alonzo Braziel, and in exchange for cash, he agreed to pose as Braziel's employer so Braziel could qualify for three loans based on false pretenses.

The jury also heard testimony from David Fuller, who sold 14611 S. Justine (Count Fourteen) and knew a false seller second mortgage and Skrobot's money was used to purchase the

property. Buyer Darryl Daugherty also testified that he used false information to qualify for a loan to buy 5708 S. Normal. Alfredo Hilado testified that he purchased several properties using false information.

The testimony was corroborated by bank records, loan files and IRS documents, all of which confirmed the existence of the scheme and the acts done in furtherance of it. As a result of the fraudulent acts of defendants and others, the lenders issued mortgage loans to buyers in an amount totaling more than $7,200,000, and incurred losses on the mortgage loans because they were not repaid by the borrowers and because at least some of the properties were abandoned or in poor condition.

### III.  ARGUMENT

#### A.  The Court Properly Permitted Introduction of Portions of Thomas' Statement to Law Enforcement Agents.

Braziel renews the argument he made before and during trial that Donald Thomas' statements to law enforcement agents should not have been admitted, even in its redacted form.[1] The government explained in its Motion *In Limine* To Admit Defendants' Statements (Dkt. No. 305) that admitting Donald Thomas' redacted confession in a trial where Alonzo Braziel was a defendant would not run afoul of *United States v. Bruton*, 392 U.S. 123 (1968).

Under *Bruton*, the admission of a defendant's confession at a joint trial may violate a co-defendant's right to confrontation if the confession also names the co-defendant. *Id*. at 126.

---

[1] The Court heard extensive and detailed argument on this motion, in particular just before the statement was introduced. Defendant has the burden of proof on this issue, and should have ordered the transcript of the Court's extensive discussion and rulings on this and the other post-trial motion issues raised in his filing. In particular, the government cleared the substance of the agent's testimony with the Court before eliciting it, and then stuck to the Court's ruling on the statement's admissibility.

However, the law is clear that a redacted form of the statement in which the co-defendant is not referred to by name, coupled with a limiting instruction, satisfies the dictates of *Bruton* and protects the constitutional rights of both defendants. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). The law is also clear that where the government elicits only those portions of a confession that do not implicate the confessor's co-defendants (as the government did at trial), there is no *Bruton* issue.

In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court narrowed the scope of *Bruton's* holding. In *Richardson*, the prosecution introduced a confession given by one of three defendants shortly after arrest. *Richardson*, 481 U.S. at 203. At the time the confession was submitted, the jury was admonished not to use it in any way against the petitioner/co-defendant. *Id*. at 204. The defendant who confessed did not testify at trial. *Id*. The *Richardson* Court rejected the petitioner's *Bruton* claim and affirmed the conviction. *Id*. at 211. The Court held that when a non-testifying defendant's statement must be linked to other evidence to implicate a co-defendant, admitting a statement at a joint trial does not violate the Confrontation Clause of the Sixth Amendment so long as the trial judge adequately instructs the jury not to consider the statement against the co-defendant. *Id*. at 208-211. The Court reasoned that where the jury must link a non-testifying defendant's statement to other evidence for the statement to implicate a co-defendant, the probability that the jury would not be able to follow a limiting instruction does not exist as it did in *Bruton*. *Id*. at 208. *Accord United States v. Brooks*, 125 F.3d 484, 501 (7th Cir. 1997) ("We have held that the redaction of a defendant's name and its replacement with such references as 'another person,' combined with a limiting instruction, complies with the right of confrontation and satisfies Bruton and Richardson.") (citing cases).

More recently in *Gray v. Maryland*, the Supreme Court stated that "[u]nless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found." 118 S. Ct. 1151, 1155 (1998). *Gray* answered an unresolved question from the *Richardson* case -- whether a "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton*'s protective rule." *Id.* at 1155. The Court held that the confession at issue in that case, which substituted blanks and the word 'delete' for defendant's name, was inadmissible under *Bruton*. *Id.* at 1157. In doing so, however, the Court maintained its approval for the use of redacted confessions with accompanying limiting instructions, and it simply distinguished the flawed redacted confession from Gray's case with an appropriate redacted confession from *Richardson*. *See id.* at 1156-57. *Gray* thus reiterated the rule that a confession that is redacted to omit references to a co-defendant (who is on trial) is admissible at a joint trial.

Subject to the proscriptions in *Gray*, in cases where the government intends to introduce the statements of a non-testifying defendant against that defendant, the rights of a co-defendant are protected by a redaction if the statement does not identify the co-defendant *on its face* -- even if other evidence at trial does tend to identify the co-defendant as the person referred to in the statement. A co-defendant's rights are similarly protected if the confession does not mention any actions taken by, or directions received from, a non-testifying co-defendant. The Seventh Circuit has restated this principle in case after case: one defendant's confession may be admitted where a co-defendant's name has been replaced by a neutral pronoun or other more general reference, or omitted in its entirety. *See, e.g., United States v. Strickland*, 935 F.2d 822, 826 (7th Cir. 1991) ("the

replacement of defendants' names with references such as 'another person,' combined with an instruction to consider the confession against only the declarant, satisfies *Bruton*); *United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990); *United States v. Madison*, 689 F.2d 1300, 1309 (7th Cir. 1982) (holding as admissible non-testifying defendant's statement that "somebody else" was present at the scene of the crime because statement did not identify co-defendant by name or any other descriptive feature); *United States v. Holleman*, 575 F.2d 139, 142 (7th Cir. 1978) (*Bruton* not violated when defendant's confession indicates he was assisted by accomplices but "his accomplices remain in the confession unnamed and not identified by race, age, size or any other means except by sex").

When it introduced Donald Thomas' confession at trial, the government elicited only statements that implicated Thomas. It used neutral pronouns and phrases, including "straw buyer" - a term Thomas himself used and which could have implicated many buyers who dealt with Thomas during the charged scheme. Importantly, before introducing Thomas' statement through the testimony of FBI Special Agent Donald Kaiser, the Court reviewed the FBI report of Thomas' interview. The Court also excused Agent Kaiser from the courtroom and asked the government to explain in detail what information it was planning to elicit through testimony. The government explained that it would elicit that Thomas said he had purchased "14820-22 Hoyne Ave, 13302 S. Franscisco in Robbins, and another property." The government also proffered that Agent Kaiser would testify that he received $20,000 from the sale of 14820-22 Hoyne in Harvey, and further that he had a straw buyer who was going to purchase Hoyne and then quitclaim deed it to Thomas; Thomas would then repurchase the property from the straw buyer several months later. Thomas agreed to make all of the mortgage payments until he purchased the property from the straw buyer,

and he paid the straw buyer $5,000 from the proceeds of the sale of the property. After extensive discussion of the law and the proffered testimony, the Court ruled that Agent Kaiser could testify consistent with the government's proffer of his testimony.

The Court's ruling was correct. The use of a neutral pronoun or general reference is permissible even where those references in conjunction with other evidence at trial implicate the defendant. *See, e.g., Briscoe, supra; Myers*, 892 F.2d at 648; *Madison*, 689 F.2d at 1309. The Seventh Circuit restated this principle in *United States v. Chrismon*, 965 F.2d 1465 (7th Cir. 1992), upholding the admission of a confession referring to other persons, ostensibly co-defendants, where the "statement includes only a reference to a collective and thus incriminates a member of the group only when linked with other evidence." *Id*. at 1471, *citing Briscoe, supra. See also United States v. Hubbard*, 22 F.3d 1410, 1421 (7th Cir. 1994).

    **B.    The Court Properly Refused to Give Braziel's "Theory of Defense" Instruction to the Jury.**

Braziel asked this Court to instruct the jury that, "the mailings in Counts Seventeen, Eighteen and Nineteen were legally compelled by federal and/or state law. As such, the government must prove that the mailings were important to the successful execution of the fraud alleged in the case." Braziel relied on *Segal* (which should have been cited as *United States v. Segal*, 299 F.Supp.2d 840 (N.D. Ill. 2004) and *Parr* in support of its proposed instruction. The defense has not provided a transcript of the Court's ruling, but the government recalls it was partly because the Court consulted with either the attorneys or judge involved in *Parr* and/or *Segal* and ruled the instruction was either not correct as a matter of law or not given to the jury. The government has reviewed the jury instructions given by the *Segal* court, and the instruction proposed by Braziel was not among them. Case No. 02 CR 112, Dkt. No. 331.

11

"A defendant is entitled to a jury instruction as to his or her particular theory of defense provided: (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial." *United States v. Prude*, 489 F.3d 873, 882 (7th Cir. 2007) (citing cases). The appellate court defers to the district court if it rejects a tendered instruction, so long as the "essential points are covered by the instructions given." *Id.*

Braziel cannot meet his burden of showing he was entitled to have the Court give his instruction. First, it is an inaccurate statement of the law. *Segal* held a mail fraud scheme could in fact be based on legally compelled mailings "made in furtherance and to sustain the alleged fraudulent scheme." *United States v. Segal*, 299 F.Supp.2d 840, 849-50 (N.D. Ill. 2004). It did not hold that the government must prove that the mailings were "important to the successful execution of the fraud" alleged in this case; it merely held that the legally compelled mailings could form the basis for the execution of the charged violations of 18 U.S.C. § 1341. For its part, *Parr* holds that any charged mailing must be "incident to an essential part of the scheme." *United States v. Parr*, 363 U.S. 370, 390 (1960). Using this test, the *Parr* court found the particular mailings at issue could not be used as executions in furtherance of the particular charged scheme, and the particular documents mailed did not contain false representations. *Id.*

Second, Braziel's theory of defense (at least, as legally stated in *Segal* and *Parr*) was already a part of the jury instructions given in this case. The court gave Govt. Instruction No. 32, a pattern instruction which informed the jury that:

> The government must prove that the United States mails were used to carry out the scheme or were incidental to an essential part of the scheme.

> In order to use or cause the use of the United States mails, a defendant need not actually intend that use to take place. You must find that the defendant knew this use would actually occur, or that the defendant knew that it would occur in the ordinary course of business, or that the defendant knew facts from which that use could reasonably have been foreseen.
>
> The defendant need not actually or personally use the mail.
>
> Although an item mailed need not itself contain a fraudulent representation or promise or a request for money, it must further or attempt to further the scheme.
>
> Each separate use of mail in furtherance of the scheme to defraud constitutes a separate offense.

Dkt. No. 363 at 30. This instruction is consistent with the law reaffirmed in *Segal* and in *Parr*. The Court also instructed the jury about the Real Estate Settlement Procedures Act (RESPA) as follows:

> The Real Estate Settlement Procedures Act (RESPA) requires that mortgage brokers and/or lenders give borrowers a Good Faith Estimate of settlement costs, which lists the charges the buyer is likely to pay at settlement, and a Mortgage Servicing Disclosure Statement, which discloses to the borrower whether the lender intends to service the loan or transfer it to another lender. If the borrower does not get these documents at the time of application, the lender must mail them within three business days of receiving the loan application.

*Id.* at 32. The lenders who testified at trial stated that RESPA letters were required to be mailed to all borrowers, and their mailing is caused by the submission of a loan application. From these instructions, Braziel could (and did) argue his theory that a legally compelled mailing was not sent in furtherance of the charged scheme to defraud.

Lastly, Braziel was not denied a fair trial when the Court refrained from giving his proposed instruction, since as addressed above, such instruction would have been an improper statement of the law, unsupported by any precedent and repetitive of the general concepts already addressed in the Court's instructions. Because Braziel has not satisfied any prong of the applicable test for giving a "theory of defense" instruction, the Court correctly refrained from giving it.

### C. The District Court Properly Admitted Rule 404(b) Evidence Against Braziel.

This Court properly admitted Braziel's guilty plea to fraud, in a case where Braziel committed a similar fraud scheme in which he and his mother defrauded the Illinois Department of Employment Security (IDES) by obtaining unemployment insurance benefits from the IDES by making false and fraudulent claims for benefits while posing as fictitious claimants. The Court ruled the prior guilty plea was relevant to Braziel's intent to defraud, and further that the other prongs of the Fed. R. Evid. 404(b) analysis had been met. *See* Dkt. No. 329.

The government argued that evidence of Braziel's prior mail fraud conviction was relevant to show his intent to defraud (as well as his knowledge, plan, and absence of mistake or accident). Evidence of prior conduct that is offered for a legitimate purpose - other than propensity - is admissible. The Seventh Circuit has created a four part test for determining the admissibility of evidence under Rule 404(b): (1) the evidence must be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence must show that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *See United States v. Anifowoshe*, 307 F.3d 643, 646 (7th Cir. 2002); *United States v. Williams*, 238 F.3d 871, 874 (7th Cir.2001); *United States v. Premcor Refining Group*, 157 F. Supp.2d 971, 975 (N.D. Ill. 2001); *United States v. Gerard*, 926 F. Supp. 1351, 1358 (N.D. Ill. 1996). Applying this test, the Seventh Circuit has upheld the admission of evidence of a defendant's prior mail fraud convictions pursuant to Rule 404(b). *See United States v. Prewitt*, 34 F.3d 436, 439-50 (7th Cir. 1994). These conditions for admissibility are likewise satisfied here.

First, the indictment charged Braziel with mail fraud, which is a specific intent crime. *See United States v. Warner*, 498 F.3d 666, 691 (7th Cir. 2007). At trial, Braziel's intention to defraud the banks and lenders involved in his property transactions was at issue, as the government had argued with respect to the 404(b) motion. Indeed, Braziel argued to the jury that he did not intent to act fraudulently in obtaining three loans with false information, but rather had acted in good faith. To that end, the government offered Braziel's prior guilty plea as additional evidence that he purposely provided false statements to obtain money to which he was not entitled, and he acted for the purpose of deceiving a victim: the IDES (in his prior case) and lenders (in this case). *See United States v. Whiting*, 471 F.3d 792, 801 (7th Cir. 2006) ("when a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent"). His prior guilty plea was offered for the purpose of showing Braziel's knowledge that he knew what he was doing when he submitted false statements and documents to get the mortgage loans.

Second, the evidence showed, and the Court found, that Braziel's prior mail fraud was nearly identical to the charged conduct and was close in time to the current charge. In both instances, Braziel submitted false statements and documents to obtain funding for which he did not qualify and to benefit himself. That the mail fraud scheme for which he was convicted in 2002 involved different people and a different victim is irrelevant because Braziel engaged in the same conduct and possessed the same intent, the intent to defraud, on both occasions. *See United States v. Lloyd*, 71 F.3d 1256, 1265 (7th Cir. 1995) ("The prior acts need not be duplicates of the one for which the defendant is now being tried."); *Premcor Refining Group, Inc.*, 157 F. Supp. 2d at 976. Further, the Rule 404(b) conduct was close in time to the charge conduct because it occurred within four years of the date of the charged conduct and less than a year from his release from prison for his 2002

15

conviction. *See, e.g., United States v. Obiuwevbi*, 962 F.2d 1236, 1241 (7th Cir. 1992) (five years between uncharged and charged acts did not preclude admission of the uncharged acts because the evidence showed a pattern connecting the acts).

Third, the Rule 404(b) evidence offered consisted of a sworn statement by Braziel that he had committed the fraud, and the Court properly found that the plea shows there is no question Braziel was guilty of the IDES fraud. It was appropriate for relevant portions of transcripts of Braziel's guilty plea to be read aloud to the jury as evidence of Braziel's intent, knowledge, plan, and absence of mistake or accident. *See United States v. Paredes*, 87 F.3d 921 (7th Cir. 1996).

Finally, the Court ruled the probative value of the testimony to Braziel's prior mail fraud conviction was not substantially outweighed by the danger of unfair prejudice. The focus is not on prejudice, but *unfair* prejudice. *United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995); *Premcor Refining Group, Inc.*, 157 F. Supp.2d at 977. "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Bogan*, 267 F.3d 614, 622 (7th Cir. 2001). Evidence of Braziel's prior conviction was not unfairly prejudicial because it shows Braziel's intent.

To further alleviate any danger of unfair prejudice, the government asked for, and the Court gave, a limiting instruction describing the proper purpose for which the uncharged crime may be considered. *See* Seventh Circuit Pattern Jury Instructions (1999), Instruction 3.04 (Govt. Instruction No. 11); *Green*, 258 F.3d at 694-95; *United States v. Asher*, 178 F.3d 486, 495 (7th Cir. 1999); *Premcor Refining Group*, 157 F. Supp.2d at 978. Juries are presumed to follow such limiting instructions, and it is unlikely the jury inferred Thomas' guilt in this case based on evidence admitted solely to show Braziel's intent. *Zafiro v. United States*, 113 S. Ct. 933, 939 (1993).

Moreover, the government did not argue or imply that the jury should convict Braziel because of a propensity to commit crime. Accordingly, the danger that the jury ignored its legal obligations and nevertheless draw a "forbidden inference" is less than slight and does not justify excluding the proffered evidence. *See United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990).

### D. The Court Properly Allowed Admission of certain Documents Pursuant to Fed. R. Evid. 902(11).

The Court properly found the government's notices of intent to admit documents pursuant to Fed. R. Evid. 902(11) were legally sufficient. Dkt. No. 329. The certifications submitted by the government took slightly different forms, but all contained the precise language required by Fed. R. Evid. 902(11). The rule does not, as Braziel suggested in his pre-trial motion contesting the admissibility of these documents, require certification by each person who drafted the business records on the date each record was created. Rather, it requires a certification from a "custodian or other qualified person" that the record "(A) was made at or near the time of the occurrence of the matters set forth, by a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice." Fed. R. Evid. 902(11). Thus, the certification can be made by a person who maintains the record as a custodian, despite that he or she works for a company that assumed control of the original documents, provided he or she can competently make the certification.

Importantly, a certification signed under penalty of perjury is just as admissible as the same, live testimony from the person making the written certification:

> Wherever, under and law of the United States or under any rule, regulation, order or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established,

17

> or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated . . . ."

28 U.S.C. § 1746. In short, the declarations submitted by the government are admissible "with like force and effect" as if the same person appeared in court, took an oath and testified to the records' authenticity. Here, each certification was signed by someone who, under penalty of perjury, swore they reviewed the records and they met the business records requirement under Fed. R. Evid. 902(11). There was no specific challenge that the persons signing the declarations did so falsely, and any such challenge would be in bad faith.

When it tendered discovery in February 2008, the government made available for inspection and copying all records obtained in the course of its investigation. Those records were maintained with the original transmittal letters and grand jury subpoenas[2] from the businesses that produced the records. Most of these transmittal letters include statements from the producing business that the records are business records, produced pursuant to grand jury subpoena. The documents were all produced by persons at the businesses with custody of the records at issue (or else they could not have provided them in the first place). In preparation for trial, the government re-approached each business, asked them to review particular records the government seeks to introduce at trial and which were previously produced by the business, and to certify under penalty of perjury that the records are business records. Pursuant to Fed. R. Evid. 902(11), those certifications are competent. Moreover, pursuant to 28 U.S.C. § 1746, those certifications are admissible in their present form and are presumed to be true declarations. Each certification identifies the person making the attestation

---

[2] The original grand jury subpoenas are filed with the Chief Judge, but the U.S. Attorney's Office has kept copies.

and identifying his or her position at his or her employer, information provided "under penalty of perjury."

There was no indication the records are inherently unreliable, such that they may run afoul of the hearsay rules. They may, of course, contain lies, but as this Court recognized at the pretrial conference, those lies were contained in the exhibits as they were created and maintained by each business, and their inclusion in the records does not undermine their admissibility.

The Seventh Circuit allows a party to introduce business records through a certification, where the documents have been available for inspection and copying. *United States v. Keplinger*, 776 F.2d 678, 692 (7th Cir. 1985) (holding business records are "unusually reliable"); *United States v. Adefehinti*, 510 F.3d 319, 379 (D.C. Cir. 2007) (relied upon by this Court) (documents bank relied upon in making lending decisions admissible pursuant to 902(11) certification, even though person making certification was not familiar with specific transactions but attested to the bank's ordinary course of activity). All defendants, including Braziel, had the opportunity to inspect and copy documents, and most took advantage of the government's offer. Braziel's attorney examined the records immediately before trial.

The Seventh Circuit has upheld the admissibility of 902(11) certifications in lieu of live witness testimony, because business records, and thus business records certifications, are not testimonial. *See, e.g., United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (defendant has no Constitutional right to "confront" business records, since they are nontestimonial); *United States v. Burgos*, 539 F.3d 641, 643-46 (7th Cir. 2008) (same). Braziel's counsel therefore has no Constitutional right to cross examine witnesses whose sole purpose of testifying is to admit business records.

In sum, admitting documents pursuant to Fed. R. Evid. 902(11) was legally proper in this trial.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully requests that this Court deny Braziel's post-trial motions for acquittal and a new trial.

Dated: May 26, 2009

                                       Respectfully submitted,

                                       PATRICK J. FITZGERALD
                                       United States Attorney

By:    /s/ Lisa M. Noller_____
        LISA M. NOLLER
        MEGAN C. CHURCH
        Assistant United States Attorneys
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-5314